**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, <br><br>                               **Plaintiff**, <br><br>            v. <br><br> **JAHLIL THOMAS**, <br><br>                               **Defendant**. | Criminal No. 11-0745 (ES) <br><br> OPINION |

**SALAS DISTRICT JUDGE**

Before the Court is defendant Jahlil Thomas's motion for compassionate release and reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). (D.E. No. 29; D.E. No. 44 ("Def. Mov. Br.")). Having considered the parties' submissions, the Court decides this matter without oral argument. *See* Fed. R. Crim. P. 43(b)(4); *United States v. Styer*, 573 F.3d 151, 154 (3d Cir. 2009). For the following reasons, the Court DENIES the motion.

**I.   Background**

On October 27, 2011, Thomas pleaded guilty to a three-count information charging him with the following: i) conspiracy to commit carjacking, contrary to 18 U.S.C. § 2119, in violation of 18 U.S.C. § 371; ii) carjacking, in violation of 18 U.S.C. §§ 2119 & 2; and iii) brandishing a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. §§ 924(c)(1)(A)(ii) & 2. (D.E. Nos. 16–20 & 24). Based on a career offender designation and a conviction under §924(c), the applicable guideline range was 262 to 327 months' imprisonment. (D.E. No. 28, Sentencing Hearing Transcript at 15:1–12.) After considering the relevant factors in 18 U.S.C. § 3553(a), submissions by counsel, the Presentence Report, and the parties' arguments, the Court

sentenced Thomas to 262 months of imprisonment and 5 years of supervised release. (*Id.* at 43:16–44; D.E. No. 22, Final Judgement, at 2–3). Thomas is currently incarcerated at the Federal Correctional Institution, Cumberland, in Maryland ("FCI Cumberland"). (D.E. No. 44-1). His projected release date is September 16, 2029. (*Id.*).

Thomas now moves for a reduction of sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), arguing that his "extensive and extraordinary rehabilitative efforts," his asthma, his race (African American), and "the conditions of his confinement" in light of the COVID-19 pandemic constitutes extraordinary and compelling reasons to release him from imprisonment and to place him in home confinement with his wife and step-children in Southern Pines, North Carolina. (*See generally* Def. Mov. Br.). The Government opposed the motion. (D.E. No. 45 ("Gov. Opp. Br.")).

## II.   Legal Standards

Once a term of imprisonment has been imposed, the Court may only modify it under very limited circumstances. *In re Morris*, 345 F. App'x 796, 797–98 (3d Cir. 2009) (citing 18 U.S.C. § 3582(c)). Relevant here, 18 U.S.C. § 3582(c)(1) provides that, in any case:

> (A) the court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that-
>
> > (i) extraordinary and compelling reasons warrant such a reduction;
> >
> > [. . .]
> >
> > and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.

The United States Sentencing Commission has promulgated a policy statement that, in relevant part, allows a court to grant compassionate release or a sentence reduction where (i) extraordinary and compelling reasons warrant a reduction in a defendant's sentence; (ii) the defendant is not a danger to the safety of others or to the community, as provided in 18 U.S.C. § 3142(g); and (iii) release from custody complies with the Section 3553(a) factors. *See* U.S. SENTENCING GUIDELINES MANUAL ("U.S.S.G.") § 1B1.13 (U.S. SENTENCING COMM'N 2018)).

## III.   Analysis

### A.   Exhaustion

As an initial matter, the Government does not dispute that Thomas has satisfied the exhaustion requirement. (*See* Gov. Opp. Br. at 9). Thomas filed his request for relief with the Bureau of Prisons ("BOP") on or about September 10, 2020, which the BOP rejected on September 30, 2020. (Def. Mov. Br. at 3; Gov. Opp. Br. at 3). The Court agrees that more than thirty days have passed since Thomas filed his request with the BOP and finds that the motion is properly before the Court for consideration pursuant to § 3582(c)(1)(A).[1] *See United States v. Harris*, 812 F. App'x 106, 107 (3d Cir. 2020) (holding that the defendant may file the motion to the Court

---

[1] Thomas filed a *pro se* motion for reduction of sentence on February 26, 2020, before the onset of the current COVID-19 pandemic. (D.E. No. 29). The Office of the Federal Public Defender ("FPD") initially declined to represent Thomas; and the Court accordingly ordered the Government to respond. (D.E. No. 32). When the Government failed to respond, the Court scheduled a telephone conference on July 24, 2020, at or around which point the FPD assumed representation of Thomas with respect to his motion for reduction of sentence. (*See* D.E No. 34). Subsequently, the parties filed briefs in support of and in opposition to Thomas's motion. (D.E. Nos. 35, 37–39). In his reply brief, Thomas represented to the Court that he had submitted a second request to the BOP for compassionate release, which included additional grounds for relief in light of the COVID-19 pandemic. (D.E. No. 31). Thomas asked the Court, *inter alia*, to hold his motion in abeyance until the exhaustion period had passed. (*Id.*). The Government, on the other hand, argued that Thomas's supplemental moving brief filed by his counsel failed to address certain ground for release that was raised in Thomas's *pro se* motion. (D.E. No. 41). The Government thus treated this ground for relief as waived. (*Id.*). Thomas's reply brief, however, allegedly re-asserted such ground, to which the Government requested a sur-reply to respond. (*Id.*). Given the parties' various requests, the Court held Thomas's motion in abeyance until October 28, 2020 and ordered each party to file a single brief containing all arguments the parties intend to present. (D.E. Nos. 42 & 43). Thomas filed its renewed brief on October 28, 2020, which is the date the Court uses for its exhaustion analysis. (*See* Gov. Mov. Br. at 4 (stating that "[o]n October 28, 2020, Thomas made the instant motion under 18 U.S.C. §3582(c)(1)(A) . . . .")).

3

"thirty days after the warden receives his request").

### B. Extraordinary and Compelling Reasons for Reduction

Per Congressional directive, the Sentencing Commission issued a policy statement that extraordinary and compelling reasons for compassionate release exist when the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13, Application Note 1(A)(ii)(I). In addition, the policy statement includes a catchall provision that allows the Director of the BOP to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the enumerated reasons described in the policy statement. *Id.* at Application Note 1(D). Because the Sentencing Commission's policy statement was issued before Section 3582(c) was amended to allow defendants to file motions for compassionate release, the policy statement refers only to motions filed by the Director of BOP. *See generally* U.S.S.G. § 1B1.13. Notwithstanding, the parties do not dispute that the policy statement applies where, as here, the motion for compassionate release was filed by the prisoner. (*See* Def. Mov. Br. at 4–5; Gov. Opp. Br. at 7 n.3).

Thomas argues that his "extensive and extraordinary rehabilitative efforts," combined with him being an African American with "moderate to severe asthma" facing a much greater risk from COVID-19, constitute extraordinary and compelling reasons for release under Application Note (D), the catchall provision, of the Sentencing Commission's policy statement. (Def. Mov. Br. at 8). In addition, Thomas argues that the inadequate medical care he received at FCI Cumberland for his asthma diminishes his ability to provide self-care during the ongoing pandemic and constitutes additional extraordinary and compelling reasons for release under Application Note

4

1(A) of the Sentencing Commission's policy statement.  (*Id.* at 12).

The Court is not persuaded that Thomas's race is an independent reason that would subject him to "a much greater risk of a more serious outcome for death from COVID-19 than others." (*See id.* at 14).  Thomas relies on various publications, including data from the CDC, to argue that black people, in this and other countries, "are dying at a disproportionately higher rate, compared to others."  (*Id.* at 13).  While this is undoubtedly true, Thomas acknowledges that such disparity is caused by the disadvantage black Americans have "in terms of access to diagnostic testing and treatment for the disease."  (*Id.* at 14).  The CDC's website Thomas relies on explicitly states that "[r]ace and ethnicity are risk markers for other underlying conditions that affect health including socioeconomic status, access to health care, and exposure to the virus related to occupation, *e.g.*, frontline, essential, and critical infrastructure workers."[2]

Here, Thomas makes no attempt at explaining how, while incarcerated, his race either directly causes an increased risk of severe illness from COVID-19, or somehow constitutes a marker for such risk.  As such, the Court finds that Thomas fails to show that being an African American increases his risk of severe illness or death from COVID-19 while incarcerated.  *See United States v. Alexander*, No. CV 19-0032, 2020 WL 2507778, at *4 (D.N.J. May 15, 2020) (finding that "it is unclear whether defendant's race places him at a greater risk of contracting COVID-19, while he is incarcerated and receiving medical treatment at the" prison); *United States v. Cherry*, No. CR 09-0715, 2020 WL 5868800, at *3 (D.N.J. Oct. 2, 2020) (same); *United States v. Torres*, No. CR 10-104-2, 2020 WL 5944278, at *5 (E.D. Pa. Oct. 7, 2020).

The Court also agrees with the Government that the records does not support Thomas's

---

[2]   CDC, *COVID-19 Hospitalization and Death by Race/Ethnicity*, https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-race-ethnicity.html (last visited Decemeber 23, 2020).

assertion that he has "moderate to severe" asthma. Based on communications with Thomas, Thomas's counsel submitted a declaration stating that Thomas's asthma "interferes with his daily activities" and that he "has nighttime symptoms of asthma at least once a week." (D.E. No. 44-6 ("Hom Declaration" or "Hom Decl.") ¶ 2(c)). The Hom Declaration further states that "Thomas has in his possession a Corticosteroid inhaler and an Albuterol inhaler" and that Thomas "uses the corticosteroid inhaler on a daily basis and the Albuterol inhaler frequently, usually every other day or sometimes twice a day." (*Id.* ¶¶ 2(b) &(c)). Based on these symptoms, Thomas argues that he has moderate to severe asthma, rendering him vulnerable in the current pandemic.[3] (*Id.* 8–19).

However, the medical records suggest that Thomas's asthma is less severe than he claims. Thomas does have a history of asthma, which was reported in 2012, shortly after he was under the custody of the BOP. (Gov. Exhibit D ("Med. Rec.") at 2 (record from July 9, 2012, and stating "New arrival here. History of asthma. Started in childhood. Uses the steroid inhaler daily and uses the Albuterol on as needed basis.")). The symptoms of Thomas's asthma were at one point more severe. (*See id.* at 6 (record from June 18, 2012, and stating "23 yo male with lifetime asthma needs albuterol pump for daytime and steroid pump for nighttime wheezing and coughing")). But by July 2013, it appears that Thomas's symptoms subsided, and he stopped using the inhalers. (*See id.* at 62 (record from July 12, 2013, and stating "History of asthma. Has not used his inhalers for a long time. He wants to be dropped from clinic.")). While the medical records continue to

---

[3] The U.S. Department of Health and Human Services provides that moderate asthma occurs if, without treatment, any of the following are true:
- Symptoms occur daily;
- Inhaled short-acting asthma medication is used every day;
- Symptoms interfere with daily activities;
- Nighttime symptoms occur more than 1 time a week, but do not happen every night; or
- Lung function tests are abnormal (more than 60% to less than 80% of the expected value).

*See Asthma Care Quick Reference Guide*, U.S. DEP'T OF HEALTH AND HUMAN SERVS., (Sept. 2012), https://www.nhlbi.nih.gov/sites/default/files/media/docs/12-5075.pdf (last visited December 23, 2020).

mark his asthma as "current" in 2013 (*id.* at 80), 2014 (*id.* at 99), 2015 (*id.* at 121), 2016 (*id.* at 127), and 2019 (*id.* at 176), nowhere in the 227-page medical records indicates that Thomas had a prescription of inhalers, or any other medication, to treat his asthma during this period. Indeed, the medical record from a health screen conducted on January 28, 2019 stated that Thomas "hasn't used inhalers for >10 years." (*Id.* at 171). A September 1, 2020 medical record indicated that Thomas' asthma was in remission. (*Id.* at 205) (stating "Asthma, unspecified, 493.90 – Remission.")). The doctor who conducted the medical exanimation stated that "[a]t this time no evidence of wheezing or respiratory compromise so no inhaler will be issued at this time." (*Id.* at 206). After seeing the doctor on September 1, 2020, which was a few days before the first time Thomas communicated with his counsel, Thomas saw the doctor again on September 17, 2020, which was two days after the second time Thomas communicated with his counsel. (*Id.* at 211). During the second visit, Thomas requested an "inhaler due to AM wheezing experienced sometimes," but the doctor again declined to issue an inhaler and stated that "[n]o wheezing auscultated so no issue of inhaler at this time." (*Id.* at 202–03 & 211). Thus, the medical records appear to undercut counsel's assertion that Thomas "ha[d] in his possession a Corticosteroid inhaler and an Albuterol inhaler" at the time he communicated with his counsel, which occurred between the two times he was denied an inhaler. The Court is also not persuaded by the statement in the Hom Declaration wherein Thomas told his counsel that he did not know why the medical unit did not record "each issuance of every inhaler he has received." (Hom. Decl. ¶ 2(e)). Quite the opposite, Thomas's medical records have detailed prescription history and even included reasons for not issuing an inhaler. The records further indicate that Thomas apparently self-reported that, by January 2019, he had not used an inhaler for more than 10 years. The Court thus finds that Thomas fails to present sufficient evidence to substantiate that his asthma his asthma is

moderate or severe.[4]  Accordingly, Thomas fails to demonstrate that his health conditions, in light of the conditions at FCI Cumberland, place him at a heightened risk of adverse consequences from COVID-19.

Thomas next argues that, since his conviction, he became "committed to living a life of redemption, focusing on improving his skills so that he is employable and productive upon his release." (Def. Mov. Br. at 6). As support, Thomas filed 23 certificates and licenses in the Heating, Ventilation, and Air Conditioning ("HVAC") and home improvement fields, which, in total, require over 1,000 hours of training. (D.E. No. 44-3; *See* Def. Mov. Br. at 6–7). Thomas also obtained his GED while incarcerated and continues to work as a cook in the prison kitchen, for which he has received good evaluations and a bonus. (D.E. No. 44-9 (stating that "Inmate Thomas continues to prove that he is a vital worker in the Food Service Department. He is extremely versatile and adapts well to changes. His positive attitude makes him a valuable co-worker to his peers. He is very attentive to details and learns quickly.")). Thomas further argues that he completed all of this work without serious incident and was only disciplined once in 2018 for non-violent "disruptive conduct."[5] (Def. Mov. Br. at 7; D.E. No. 44-2). Finally, Thomas argues that his marriage, which occurred during his incarceration, furthered the positive changes in his life and that he looks forward to a life with his wife and five children, whom he "loves as his own

---

[4] If Thomas does have moderate to severe asthma, the Centers for Disease Control and Prevention ("CDC") lists moderate to severe asthma as a condition that *may* increase the risk for severe illness from COVID-19. CDC, *Coronavirus Disease 2019, People with Certain Medical Conditions,* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma html (last visited December 23, 2020). Courts from the Third Circuit have denied motions for compassionate release based on, *inter alia*, moderate to severe asthma, recognizing that there was insufficient evidence supporting that moderate to severe asthma increased risk of severe illness associated with COVID-19. *See, e.g.*, *United States v. Vurgich*, No. 18-0034, 2020 WL 4335783, at *4 (D. Del. July 28, 2020) (stating that "the CDC website does not offer any substantial support for the proposition that he is at any substantially greater risk for complications from COVID-19 than a completely healthy individual in prison").

[5] Thomas was disciplined under sanction code "299- Disruptive Conduct -High." (D.E. No. 44-2). According to BOP's Inmate Discipline Program, sanction code 299 corresponds to "[c]onduct which disrupts or interferes with the security or orderly running of the institution or the Bureau of Prisons most like another High severity prohibited act." BOP, Inmate Discipline Program, https://www.bop.gov/policy/progstat/5270_009.pdf (July 8, 2011).

biological kids." (Def. Mov. Br. at 7).  These extensive and positive rehabilitation efforts, Thomas argues, demonstrate that "he has channeled his deep remorse for his offense conduct into a path forward that incorporates productivity." (*Id.* at 8).

The Court is impressed by Thomas's efforts and accomplishments.  However, the Congress, in directing the Sentencing Commission to "describe what should be considered extraordinary and compelling reasons for sentence reduction," specifically instructed that "[r]ehabilitation of the defendant *alone* shall not be considered an extraordinary and compelling reason."  28 U.S.C.A. § 994 (emphasis added).  Thomas also fails to identify any legal support where extensive rehabilitation accomplishments were the sole reason to meet Section 3582 and the policy statement's "extraordinary and compelling" standard.  Having found that Thomas's race and medical conditions do not expose him to a heightened risk of severe illness from COVID-19, the Court further finds that his extensive rehabilitation efforts, without more, does not constitute extraordinary and compelling reasons that may justify an early release.

The Third Circuit made clear that "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread."  *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020).  Having found that Thomas's race and medical conditions do not expose him to a substantially greater risk for complications from COVID-19, and that his rehabilitation alone is insufficient for release under 28 U.S.C. § 994, the Court finds that Thomas fails to establish extraordinary and compelling reasons for release under Application Notes 1(A) and Application Note 1(D) of the Sentencing Commission's policy statement.

9

### C.     Section 3553(a) Factors and Dangerousness

Without demonstrating extraordinary and compelling reasons for release, Defendant has not met his burden. Nevertheless, the Court's conclusion is also supported by an analysis of the Section 3553(a) factors. The applicable Section 3553(a) factors include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a). These factors are examined in the context of the requirement that the court "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." *Id.*

At the sentencing hearing, the Court emphasized the severity of Thomas's offense. The Court was concerned that the carjacking victim was "laying on the floor with someone pointing a shotgun at him and he [did not] know whether he [was] going to live another day because somebody want[ed] to take his car." (D.E. No. 24 ("Sentencing Tr.") at 36:1–4). Thomas committed the crime at 12:32 in the afternoon, and the victim was going home when he was confronted with a shotgun. (*Id.* 36:6–11 & 37:4–9). Based on the severity of the offense, the Court declined to vary from the applicable guideline range. (*Id.* at 37:7–9).

The Court further found that carjacking was an epidemic in Newark, putting the residents

in the area in fear. (*Id.* at 36:12–37:3). The Court thus explicitly stated the need for general deterrence. (*Id.* at 37:18–20). At sentencing, Thomas also argued that a shorter sentence was sufficiently punitive, given that he "was relatively young (age 21) at the time of the offense conduct and had committed two prior state drug offenses at the age of 18 . . . that qualified him for the enhanced career offender guideline." (Def. Mov. Br. at 12; *see* Sentencing Tr. at 24: 24–27:21). The Court disagreed in light of the nature and circumstances of the offense and Thomas' criminal history. (*See id.* at 37:21–39:3). Among other things, the Court found that Thomas had been released from state custody on March 1, 2010, and then faced a violation of parole shortly thereafter, on April 26, 2010. (*Id.* at 38:8–11). It "trouble[d] the Court even more" that Thomas was "released from State custody on June 21, 2010, and he commit[ed] this [carjacking] offense in January of 2011, six months later." (*Id.* at 38:14–17). The Court observed that Thomas had been released from prison, then reentered prison for a parole violation, and then committed the instant offense shortly thereafter. (*Id.* at 38:21–23). In addition, Thomas had escalated from his prior conduct to using a shotgun for carjacking. (*Id.* at 38:23–25). Ultimately, while Court "ha[d] the discretion, and under other circumstances, probably would have gone to the middle or top of the range for the offense in question," the Court considered factors, such as the history and characteristics of the defendant, and sentenced him to 262 months.

To reduce Defendant's sentence now undermines these important factors that the Court considered and still hold true today—namely, the seriousness of the offense, the need to promote respect of the law, and necessity for specific and general deterrence. At the time of the motion, Thomas has served approximately 117 months, which is about 44.7% of the 262 months the Court initially imposed, or about 52% of 225 months, taking into account good time credit. (*See* Def. Mov. Br. at nn. 1 & 38). Granting Thomas's request for compassionate release would essentially

11

cut Thomas's term of imprisonment in half. Considering the nature of the offense and Thomas's history of recidivism, a sentence of 117 months would be insufficient to reflect the seriousness of the offense, to promote respect for the law, or to afford adequate deterrence to criminal conduct. *See* 18 U.S.C. § 3553(a)(2); *United States v. Pawlowski*, 967 F.3d 327, 330-31 (3d Cir. 2020) (ruling that in deciding a motion for compassionate release, a district court may consider the amount of time remaining on a defendant's sentence); *see also United States v. Brown*, No. 07-0019, 2020 WL 2466081, at *4 (D.N.J. May 13, 2020) (denying motion for compassionate release where cutting defendant's term of imprisonment in half "would certainly fail to reflect the seriousness of his violations").

As discussed above, the Court has considered the evidence as to Thomas's post-sentencing efforts at rehabilitation. However, those efforts do not sufficiently change the Court's Section 3553(a) analysis in light of the time remaining on Thomas' sentence.

**IV.     Conclusion**

For the foregoing reasons, Thomas's motion is DENIED. An appropriate Order accompanies this Opinion.


Date: December 23, 2020

*s/Esther Salas*
**Esther Salas, U.S.D.J.**

12